# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                                  CASE NO.  4:15cr10-RH/CAS

JAMES S. DORAN,

      Defendant.

_____/

## STATEMENT OF REASONS FOR DENYING
## THE MOTION FOR JUDGMENT OF ACQUITTAL

The defendant, a university professor, stole $10,000 and diverted $350,000 from a student investment fund.  A federal grand jury indicted the defendant on one charge: violating 18 U.S.C. § 666.  The statute prohibits theft or misapplication of funds by an agent of an organization that receives more than $10,000 in federal benefits, including grants, in a one-year period.  A jury convicted the defendant after a full and fair trial—indeed, an extraordinarily clean trial, with no objections to the jury instructions and no meaningful evidentiary rulings adverse to the defendant.

The defendant moved for judgment of acquittal.  This Statement of Reasons explains the ruling denying the motion.  The case presents an easy sufficiency-of-

the-evidence issue and a more difficult legal issue of first impression: whether applying the plain language of § 666 to this conduct exceeded the limit of congressional authority under the Spending Clause.

## I.  Facts

The defendant James S. Doran was a professor in the College of Business at Florida State University.  One of his responsibilities—in addition to teaching classes and publishing scholarly articles—was to serve as the faculty adviser to the Student Investment Fund or "SIF."  The SIF was an actual investment fund that was established so that FSU business students could gain experience making and managing actual investments.  It could be analogized to a law or medical school's clinical program—students doing actual work in an effort to learn how to do it properly.

The SIF was organized as a not-for-profit corporation.  It had an investment account at a brokerage house and also kept uninvested cash in a local bank account.

At the relevant times, the SIF's funding came from two sources: an initial $100,000 private investment and a $1,000,000 investment by the FSU Foundation. The Foundation is a not-for-profit corporation that solicits private contributions and supports FSU.

### A. The Personal Account

Separate and apart from his work at FSU, Dr. Doran managed an investment account in the name of Implied Capital, LLC. The account has variously been described as his own "personal account" or as his "friends and family" account; funds in the account belonged to Dr. Doran himself as well as friends and family members. The account had nothing to do with FSU. This order sometimes refers to the account as the "personal account."

The personal account was a margin account. This required the account to maintain capital or equity sufficient to meet the broker's margin requirements, calculated in real time based on the actual (and fluctuating) value of the account's investments. (ECF No. 76 at 180-81.) On May 20, 2010, the account suffered a "margin violation"—that is, the value of the account's investments dipped below the required level. This resulted in the involuntary liquidation of an investment, decreasing the account's unfunded investments, increasing the account's cash, and curing the margin violation.

### B. The Transfers

 Six days later, on May 26, 2010, Dr. Doran moved $100,000 from the SIF's bank account into the personal account. Dr. Doran made additional $100,000 transfers on June 8 and June 17, 2010, bringing the amount of SIF funds in the personal account to $300,000. Dr. Doran did not disclose the transfers to the SIF

Board of Directors, the students, or anyone else.  He would later claim—falsely—that the students had suggested and indeed insisted that he do this.  (ECF No. 76 at 137; *see also id.* at 15.)  And he would claim he gained no benefit from the transfers, even though the transfers plainly improved the personal account's margin position.  (*See id.* at 195.)

In the fall of 2010, there were discussions about the need for an audit of the SIF, as required for all entities associated with FSU.  On November 29, 2010, Dr. Doran met with the Dean of the College of Business, who also served as chair of the SIF Board of Directors.  The Dean asserted that an audit was required.  On the next day, November 30, Dr. Doran moved the $300,000 back from his personal account into the SIF bank account.

The funds stayed in the SIF bank account until after the end of the year.  When no audit was commissioned, Dr. Doran began moving SIF funds back into his personal account.  He transferred $100,000 on January 5, another $100,000 on January 14, another $100,000 on January 28, and finally $50,000 on March 18, all in 2011, for a total of $350,000.  He did not disclose the transfers to the SIF Board of Directors, the students, or anyone else.

In June 2011, the FSU Foundation's chief financial officer, who also served as a member of the SIF Board of Directors, again asserted that the SIF was required to undergo an audit.  Dr. Doran angrily threatened to quit if an audit was

undertaken.  He says he was concerned only about having to devote time to an audit and he did not believe that, as the fund manager, he should have any role in arranging an audit.

Roughly a year after the second set of transfers, in February 2012, the SIF Board hired a certified public accountant to conduct an audit.  The auditor quickly discovered that $350,000 was missing.  Dr. Doran was confronted, he acknowledged moving the funds into his personal account, he said this was good strategy because it protected the funds from the risk of a bank collapse, and he immediately returned the funds, though without interest.  Dr. Doran did not disclose the 2010 transfers totaling $300,000, but they were brought to light through follow-up audit procedures and an investigation by the FSU inspector general.  Dr. Doran eventually paid interest on the funds transferred in 2011—and perhaps also on the funds transferred in 2010—as calculated by Dr. Doran and the CPA who conducted the audit.  (*Compare* ECF No. 76 at 138–41 (testimony of university representative that interest was eventually paid only on the 2011 transfers, not on the 2010 transfers), *with* ECF No. 77 at 124 (testimony of Dr. Doran that the interest payment covered both sets of transfers).)

Members of the SIF Board of Directors were concerned that other investors in Dr. Doran's personal account—his friends and family members—might later assert, if the account suffered a loss, that the loss should be borne partly by the SIF,

which, after all, had been a participant in the account.  The Board demanded, and

Dr. Doran signed, an indemnity agreement, promising to hold the SIF harmless for

any claims that might arise from these transactions.

### C. The $10,000 Payment

Meanwhile, back in 2010, Dr. Doran hired Price Waterhouse Coopers to

conduct a performance audit of his personal account.  He agreed to pay a fee of

$10,000.  On July 26, 2010, Dr. Doran paid for the audit with a check drawn on the

SIF bank account.  He disclosed this to nobody.  The transaction was discovered

during the 2012 audit.  When confronted about this at that time, Dr. Doran offered

an explanation.  He would later offer a different, wholly inconsistent explanation.

The first explanation, as set out in an email Dr. Doran admittedly wrote

when first confronted, was this.  Dr. Doran intended to hire PWC to conduct a

performance audit of the SIF, not the personal account, for a fee of $10,000.  The

personal account and the SIF investment account were maintained at the same

brokerage house.  Dr. Doran inadvertently sent PWC the brokerage statements for

the personal account, not the SIF.  When Dr. Doran received the audit report, he

discovered the mistake; he knew at that point that the audit was of no benefit to the

SIF.  The email did not explain why Dr. Doran told nobody of this mistake and

instead simply paid for the audit with SIF funds.

The second explanation was that Dr. Doran intentionally ordered a performance audit of the personal account and simply picked up the wrong checkbook—the SIF checkbook—when paying the bill.  Dr. Doran now says this is the true explanation.  Dr. Doran says the error was not caught because a $10,000 cash transaction is inconsequential for an investment account of this magnitude—even though the SIF had few cash transactions.

In support of this explanation, Dr. Doran says he had sufficient funds in an Implied Capital account at a different bank to have written a $10,000 check on that account.  But the account statement he introduced is to the contrary; it shows a checking-account balance at that date of $6,137.13.  (Def.'s Ex. 27, fourth page.)  To be sure, Dr. Doran and his wife had a checking account with a balance just above or below $10,000—Dr. Doran introduced two of the statement's five pages, making it impossible to know the actual balance at the relevant date—and a savings account with a balance in excess of $25,000.  Even so, it was Implied Capital, not Dr. Doran individually, who owed $10,000 for the audit.  One would not expect the bill to be paid by Dr. Doran individually.  Moreover, a check ordinarily cannot be drawn on a savings account.  Dr. Doran had no burden to prove anything—but the jury was entitled to consider that, with all his financial expertise, he chose to introduce into evidence partial bank statements that undercut

rather than supported the claim that a $10,000 check could easily have been written on an Implied Capital account.

During his trial testimony, after insisting that he simply wrote the $10,000 check on the wrong account by mistake, Dr. Doran tried to explain the earlier, inconsistent email. His rambling, disjointed explanation might have left the jurors thinking, "Oh, what a tangled web we weave . . . ."

After being confronted about the check in 2012, Dr. Doran repaid the $10,000, without interest.

### D. Federal Funds

FSU is a major research university that receives many millions of dollars annually in federal grants. Funds are received monthly. The critical period, for our purposes, is from May 1, 2010, through April 30, 2011, because that is the period charged in the indictment. The record does not specify—because the government did not try to prove—the precise amount received during that period. But the record makes clear that the amount was in the millions. Indeed, the amount almost surely exceeded $100 million.

The funds invested in the SIF came entirely from a private individual and the FSU Foundation. The FSU Foundation received no federal funds at all. So none of the funds invested in the SIF came from the federal government. But FSU,

which did receive federal funds, provided support for the SIF, including, for example, by paying Dr. Doran's salary and providing classroom space.

## II. The Standard of Review

On a motion for judgment of acquittal, the evidence must be viewed, and all reasonable inferences must be drawn, in the government's favor.  The question is whether, viewing the evidence that way, a reasonable jury could find the defendant guilty beyond a reasonable doubt.  *See, e.g.*, *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).

## III.  The Charge and the Governing Statute

The one-count indictment charged Dr. Doran with violating 18 U.S.C. § 666(a)(1)(A).  That section makes it a federal crime to steal or misapply property if four specified conditions are met.  The statute uses more words, as statutes often do; here the statute says "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies" property.  For convenience, this order sometimes uses "steal or misapply" as a shortened synonym for the longer list.  The indictment used the whole list, tracking the statutory language.  The indictment referred to property without explicitly identifying the $10,000 payment or the 2010 and 2011 transfers from the SIF account to the personal account, but those were the basis for the charge.

The four conditions that must be met are these.

First, the defendant must be "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof." *Id.* § 666(a)(1).  The indictment charged that Dr. Doran was an agent of FSU.

Second, the property must be "valued at $5,000 or more." *Id.* § 666(a)(1)(A)(i).

Third, the property must be "owned by, or . . . under the care, custody, or control of such organization, government, or agency." *Id.* § 666(a)(1)(A)(ii).  The indictment charged that this condition was met—that the property was under FSU's "care, custody, and control."

Fourth, the organization—in this case, that means FSU—must, "in any one year period," receive "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." *Id.* § 666(b).  The indictment charged that FSU received more than $10,000 in federal benefits in the one-year period that began on May 1, 2010.

## IV.  Applying the Statutory Language

The Supreme Court has said the language of § 666 is "expansive" and "unqualified." *Salinas v. United States*, 522 U.S. 52, 56 (1997).  In construing § 666, the Eleventh Circuit has invoked "the bedrock statutory-interpretation principle: a statute's plain meaning controls absent ambiguous language or absurd

results." *United States v. Chafin*, 808 F.3d 1263, 1270 (11th Cir. 2015). The Eleventh Circuit has noted more than once that "the Supreme Court has repeatedly rejected 'statutory constructions aimed at narrowing § 666's scope, in favor of a broad reading' based on the statute's 'ambitious objective.' " *Id.* at 1272-73 (quoting *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012)). Under the statute's plain language, the question of whether the government proved each element of this offense is easy. The government did.

### A.   *Theft or Misapplication of Funds*

Dr. Doran stole (or perhaps, using common-law terminology, "embezzled") the $10,000 in SIF funds that he paid to Price Waterhouse Coopers for audit services rendered for Dr. Doran's personal account. Clearer proof could hardly be demanded. The audit report was for the personal account; Dr. Doran admitted it. The report was of no value to the SIF; Dr. Doran admitted it. Dr. Doran paid for the report with SIF funds; he admitted it, and the check bearing his signature is in the record. Dr. Doran has given two allegedly innocent explanations for paying for the audit with SIF funds, but the explanations are inconsistent and implausible, and in any event, the jury was not required to accept them. If this were a theft case in state court, the argument that this proof is insufficient would be a nonstarter.

The proof is nearly as clear on the transfers. Dr. Doran himself moved funds out of the SIF account into his personal account. He told nobody. He made the

first transfer six days after suffering a margin violation and forced liquidation of an investment.  The infused funds shored up the account, making an additional margin violation and forced liquidation less likely.  When it appeared an audit of the SIF might be imminent—the day after Dr. Doran discussed this with the Dean and chair of the SIF Board—Dr. Doran moved the funds back into the SIF account.  He paid no interest.  When the audit talk subsided, Dr. Doran again moved SIF funds into his personal account.

Dr. Doran has offered explanations, sometimes inconsistent, sometimes implausible, and always explanations the jury was not required to accept.

He first said the students suggested this strategy, but he now admits the students had nothing to do with it—that they didn't even know about it.

Dr. Doran now says he had authority to manage the fund himself during breaks when students were gone, but not all the transfers occurred during breaks. In any event, authority to manage the fund hardly meant authority to put the SIF's assets in his own personal account for his own purposes.

Dr. Doran says banks were failing and their accounts were FDIC-insured only up to $250,000.  But putting funds in the personal account—an investment account that was beyond the knowledge or control of anyone other than Dr. Doran and could suffer trading losses—hardly eliminated all risk.  Moreover, the bank balance was only $400,000; most of the SIF's funds were in a separate brokerage

account.  Dr. Doran thus needed to move only $150,000, not $300,000, to have full

FDIC coverage of this account.  The SIF could have opened another account at a

different bank and thus secured full FDIC coverage.  Dr. Doran says putting the

funds in the personal account (rather than establishing a new bank account) saved

fees, but the fee for opening a bank account to hold substantial funds with almost

no activity would surely have been little or nothing.  More importantly, saving a

small fee seems an implausible excuse for diverting this much cash from a fund of

this nature.

Dr. Doran says he moved the funds back into the SIF bank account when he

became worried about the possibility of negative interest rates on money-market

accounts, but that risk was surely remote, and dealing with any such risk could

have been deferred until negative rates were adopted, if they ever were.  The

discussion of an audit with the Dean just the day before seems a far better

explanation for moving the money at that time.

Perhaps most remarkably, Dr. Doran says he deliberately waited to move the

SIF funds into his personal account until after May 20, 2010, the date of the forced

liquidation.  Dr. Doran says he waited so it would be clear he was obtaining no

personal benefit from the transfers—so nobody could say he was shoring up his

margin position.  But of course, by infusing the SIF funds, he *did* shore up his

margin position, and he did it just six days after the margin violation.  His assertion

that this provided no benefit, and that he *knew* this would provide no benefit, rests on the implicit assertion that he *knew* his investments would not dip further—that there would not be another margin violation.  Dr. Doran has not explained how he alone, among all the world's investors, could know that investments of this kind would not lose value, or why, if he did have such perfect foresight, he ever suffered a margin violation in the first place.

As it turned out, Dr. Doran's investments did not dip further, or at least did not dip far enough that there would have been another margin violation, even without the infused SIF funds.  Hindsight, as they say, is 20–20.  But when Dr. Doran moved the funds, the prospect of a further dip in portfolio value was present.  The infused funds provided a backstop.  Or so the jury was entitled to find.

In short, Dr. Doran stole or embezzled $10,000 and misapplied another $300,000, later increased to $350,000.  The jury got it right.

## B.  Dr. Doran Was an Agent of FSU

The first § 666 condition is that the defendant must be an agent of an organization or of a state, local, or Indian tribal government or agency.  FSU is an organization and a state institution.  Dr. Doran was an FSU tenured professor—an employee.  He was an agent of FSU.  He has not asserted otherwise.

### C.  The Property Was Valued at More Than $5,000

The second § 666 condition is that the stolen or misapplied property must

exceed $5,000 in value.  Here the property was money, and the amount of each

transaction exceeded $5,000.  Dr. Doran has not asserted otherwise.

### D.   The Property Was Under FSU's Care, Custody, or Control

The third § 666 condition is that the stolen or misapplied property was

owned by *or* under the care, custody, or control of the organization at issue—in

this case, FSU.

FSU created the SIF.  The SIF Board of Directors consisted primarily of

FSU employees and was chaired by the Dean of the College of Business.  The vice

chair of the Board and faculty adviser to the SIF was Dr. Doran.  All of these FSU

employees acted for the SIF as part of their duties for FSU.  None was paid or

employed separately by the SIF.

Dr. Doran testified that he was in control—indeed, sole control—of the

SIF's funds.  He moved the funds from the SIF account to his personal account.

He wrote the $10,000 check.  The funds were under his care—that is, under the

care of an FSU professor acting in his capacity as such.

The jury was entitled to find that the funds were under FSU's care, custody,

or control.  Any contrary finding would make no sense.

### E.  FSU Received More Than $10,000 in Federal Benefits

FSU is a major state university that receives hundreds of millions of dollars in federal research grants for such things as the national high-magnetic laboratory and scientific and medical research.  The federal funds are paid directly to FSU, not for services rendered, but to promote research and education that, in the federal government's view, serve the public interest.  On any reading of the word "benefits," these millions of dollars are benefits.

The government's proof on the amount paid to FSU during the critical one-year period was ham-fisted, but the government eventually got there, proving that direct payments from the federal government to FSU came in monthly and totaled well over $100 million dollars per year.  Aside from criticism of the government's failure to ask its witness the pertinent, straightforward question—how much did FSU receive in federal grants in the period from May 1, 2010, to April 30, 2011, and what were those grants for—any assertion that the proof on this subject is insufficient blinks reality.

To be sure, not every federal payment to an organization qualifies as a "benefit."  The statute itself excepts "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c).  In *Fischer v. United States*, 529 U.S. 667 (2000), the defendant asserted that Medicare payments to a hospital were benefits only to

the patients; the defendant asserted that for the hospital, the payments were compensation for services rendered, not "benefits."  The Supreme Court disagreed, saying the payments were benefits to the hospital, but not on the ground that all cash payments are benefits.  Instead, the Court said Medicare is a comprehensive federal program intended to benefit not just patients but also to provide for and improve the quality of medical care across the board—to benefit hospitals and thus to promote the public interest.  *Id.* at 679-80.  Building on *Fischer*, the Eleventh Circuit has said the requirement for a "comprehensive" federal program applies more broadly—not just to payments for services rendered like those involved in *Fischer*, but also to outright grants, at least when the grants are not made directly to support the activity in which the defendant is engaged.  *See United States v. McLean*, 802 F.3d 1228, 1231 (11th Cir. 2015); *United States v. Edgar*, 304 F.3d 1320, 1327 (11th Cir. 2002).

None of this makes a difference here.  FSU was the direct beneficiary of grants under a comprehensive federal program promoting education and the sciences in the public interest.  Any assertion that FSU did not receive federal "benefits" misses the mark.  Had Dr. Doran stolen federal grant funds, rather than funds with no direct connection to the grants, the assertion that § 666 did not apply because FSU did not receive $10,000 or more in federal benefits would be a nonstarter.

## V.  The Real Issue: Narrowing the Statute's Plain Language

Statutes ordinarily should be applied based on their plain language.  That is so for criminal statutes no less than—and sometimes more than—others.  The Eleventh Circuit has invoked this principle in applying § 666.  *See United States v. Chafin*, 808 F.3d 1263, 1270 (11th Cir. 2015).  Applying this statute this way would make this an easy case: Dr. Doran violated the statute and was properly convicted.

In a series of cases, though, the Supreme Court and the Eleventh Circuit, as well as other circuits, have suggested that applying § 666 too broadly would risk a constitutional violation—a federal intrusion into state prerogatives.  In a subsection not at issue here, § 666 applies to bribes and kickbacks, still limited to organizations that receive federal benefits.  Courts have recognized that not every bribe or kickback case belongs in federal rather than state court.  The same is true of theft cases.  Dr. Doran could have been prosecuted in state court, but he was not.

This does not call into question the validity of § 666.  The Supreme Court has explained the constitutional basis for the statute:

> Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, Art. I, § 8, cl. 1, and it has corresponding authority under the Necessary and Proper Clause, Art. I, § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars.

*Sabri v. United States*, 541 U.S. 600, 605 (2004).

This explanation of the statute's constitutional basis focuses most directly on the federal funds themselves.  But the Supreme Court has squarely and repeatedly rejected the assertion that there must be a connection between the federal funds and the criminal conduct—the bribe or, as in our case, the theft.  *See id.* (rejecting a bribery defendant's facial attack on § 666 and recognizing that there need not be a connection between the federal funds and the alleged bribe); *Fischer v. United States*, 529 U.S. 667 (2000) (upholding a healthcare consultant's § 666 fraud and kickback conviction based on a hospital's receipt of federal Medicare payments); *Salinas v. United States*, 522 U.S. 52 (1997) (upholding a local jailer's § 666 bribery conviction despite the absence of any demonstrated effect on federal funds).

Under these cases and the Eleventh Circuit's application of them, the test is not whether there was a connection between the federal funds and the criminal conduct, but only whether the federal funds were provided under "sufficiently comprehensive programs."  *United States v. Edgar*, 304 F.3d 1320, 1325 (11th Cir. 2002); *see also United States v. McLean*, 802 F.3d 1228, 1236 (11th Cir. 2015). As set out above, the grants provided to FSU easily meet this test.

To this point, then, the decisions all cut strongly in the government's favor. The Supreme Court ruled for the government in *Sabri*, *Fischer*, and *Salinas*.  The

Eleventh Circuit ruled for the government in *Chafin* and *Edgar* and other cases. The defendant prevailed in *McLean*, but only because the government failed to prove that the organization at issue received $10,000 or more in the relevant period under a comprehensive federal program; indeed, it was unclear whether the organization at issue received any federal funds at all during that period.

In one respect, though, Dr. Doran's case is different.  He stole or misapplied funds of the SIF.  The federal funds flowed into FSU, never into the SIF.  The SIF received no federal funds at all.  As the cases cited above make clear, it ordinarily makes no difference that federal funds flow into one program but the theft or bribe or kickback occurs in an unrelated program.  One reason is that money is fungible; "money can be drained off here because a federal grant is pouring in there."  *Sabri*, 541 U.S. at 606.  Here, though, money could not be drained off "here" (from the SIF) because money was pouring in "there" (into FSU); the accounts of the SIF and FSU were wholly separate.

The critical question is whether this changes the result.  It is a question of first impression.  And there are considerations that cut each way.

The better view is that stealing or misapplying SIF funds still violated § 666, even though no federal funds—and indeed no FSU funds—flowed into the SIF. The federal interest in protecting the integrity of organizations that receive federal funding is strong.  The interest is compromised not only by theft of federal funds

or by bribes or kickbacks that directly affect the expenditure of federal funds; the interest also is compromised when an organization or its agents are corrupt. Dr. Doran was an agent not just of the SIF but of FSU. No prudent benefactor would knowingly provide funds to an organization that employs a thief—regardless of whose funds the thief makes a practice of stealing. It makes sense, then, that § 666 prohibits not only theft of federal funds, and not only theft of funds owned by a covered organization, but also theft of funds "under the care, custody, or control" of a covered organization. 18 U.S.C. § 666(a)(1)(A)(ii). The limit on the scope of the statute, as the cases cited above recognize, is the nature of the federal funding, not which funds a corrupt agent manages to steal.

It bears noting, too, that the distinction is not as stark as it might seem between this case, in which FSU and the SIF must maintain wholly separate accounts, and more typical cases like those cited above. FSU hired Dr. Doran and other personnel who provided services to the SIF. FSU provided the classroom space and other support. So FSU, the recipient of federal funds, provided financial support for the SIF, much as in any typical case. Moreover, many organizations keep separate accounts and restrict the movement of funds between those accounts. Grant funding is often tightly regulated. The Supreme Court's reference to draining off money here because grants are pouring in there makes a valid point but is not always literally true. And it is at least clear that in a § 666 prosecution,

the government need not prove that money could be moved between accounts in that manner.  Congress included no such requirement in the statute's plain language, and the federal interest in controlling corruption in federally funded programs exists with or without any such restriction on the movement of funds. When an organization receives federal funding as part of a sufficiently comprehensive program, there is a federal interest in ensuring the organization's integrity.  No court has held the contrary.

The Supreme Court's Commerce Clause decisions support this result. Congress's authority under the Commerce Clause is not as broad as its authority under the Spending Clause.  But even under the Commerce Clause, the Supreme Court has repeatedly recognized that Congress can reach a single act that, in combination with many such acts, could affect commerce.  This is so even if the single act, viewed in isolation, would have little if any actual impact on commerce. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005).

The same principle applies here.  Viewed in isolation, stealing $10,000 or misapplying $350,000 from a student investment fund operated by a university, when the fund consists only of nonfederal dollars, may have little actual impact on federal interests.  But multiple instances of public corruption—theft, bribery, or kickbacks—can have a devastating impact.  To confirm this one need only

compare the economies of the United States and similar countries, on the one hand, to the economies of countries in which corruption is widespread.

Congress adopted § 666 in 1984 to combat corruption in federally funded organizations; prior laws had proven insufficient to accomplish that goal. *See, e.g.*, *Sabri*, 541 U.S. at 606-07; *Chafin*, 808 F.3d at 1269. The funds that were stolen and misapplied here were not federal funds, but this is precisely the kind of corruption that Congress targeted, and FSU is precisely the kind of federally funded organization Congress sought to bring within the statute's coverage. Applying § 666 to Dr. Doran is not unconstitutional.

## VI. Conclusion

Dr. Doran stole $10,000 and misapplied $350,000. The conduct violated § 666 when interpreted based on the statute's plain language. The Supreme Court and the Eleventh Circuit have recognized that the Constitution limits the reach of § 666. But those courts have also said that the Constitution is satisfied when federal funding has been provided to a covered organization under a sufficiently comprehensive program. That test is easily met here. Dr. Doran's motion for judgment of acquittal could succeed only if an additional constitutional limit were

imposed.  The better view is that no such limit should be applied on these facts.

For these reasons, the motion for judgment of acquittal, ECF No. 56, has been denied.

SO ORDERED on June 23, 2016.

s/Robert L. Hinkle_____
United States District Judge